IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KARIS P. RATAICZAK, Jr.,

        Plaintiff,

        v.                                Civil Action No. 2:05-CV-42

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.


**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**


**I.  Introduction**

A.    Background

Plaintiff, Karis P. Rataiczak, Jr., (Claimant), filed his Complaint on May 18, 2005,

seeking Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed her Answer on July 20,

2005.[2]  Claimant filed his Motion for Summary Judgment on August 16, 2005.[3]  Commissioner

filed her Motion for Summary Judgment on September 12, 2005.[4]  Claimant filed his Response on

---

[1] Docket No. 2.

[2] Docket No. 6.

[3] Docket No. 9.

[4] Docket No. 10.

September 20, 2005.[5]  On August 17, 2006, Claimant filed a Motion to Remand.[6]  Commissioner

filed a Response to that Motion on August 24, 2006.[7]  Claimant filed a Reply to Commissioner's

Response on September 1, 2006.[8]  That same day, Claimant also filed a Suggestion of Death of

Karis P. Rataiczak, Jr.[9] and a Motion to Substitute Party.[10]

B.      The Pleadings

   1. Claimant's Motion for Summary Judgment.

   2. Commissioner's Motion for Summary Judgment.

   3. Claimant's Motion to Remand.

   4. Claimant's Motion to Substitute Party.

Claimant's Motion to Substitute Phyllis Ann Waugh, Executrix of Claimant's estate, as

Plaintiff, is hereby **GRANTED**.  From this point forward in this opinion, Waugh will be referred

to as the Plaintiff.  Rataiczak, however, will continue to be referred as "Claimant."

C.      Recommendation

I recommend that:

   1. Claimant's Motion for Summary Judgment be DENIED.

   2. Commissioner's Motion for Summary Judgment be GRANTED because

---

[5] Docket No. 11

[6] Docket No. 13

[7] Docket No. 14

[8] Docket No. 15

[9] Docket No. 17

[10] Docket No. 16

substantial evidence supports the ALJ's determination to find other impairments were not severe, to conclude Claimant did not meet the requirements for disability at the third step of the disability evaluation process, to find Claimant's testimony only partially credible, and because the ALJ asked a proper hypothetical to the Vocational Expert. Furthermore, Claimant's death does not present grounds for remand since it is not new and material evidence

## II.  Facts

A.    Procedural History

Claimant first filed an application for Disability Insurance Benefits on December 5, 2002, alleging disability since October 28, 2002.  The claim was denied initially and on reconsideration. Claimant timely filed a request for review before an ALJ.  Claimant received a hearing before an ALJ on November 9, 2004 in Lewisburg, W.V.  On November 23, 2004, the ALJ issued a decision adverse to Claimant.   His case was heard before an ALJ on January 8, 2003.  The ALJ ruled against Claimant on January 25, 2003.  Claimant filed a request for review from the Appeals Council, but it denied this request on March 30, 2005.  Claimant filed this action, which proceeded as set forth above.

B.    Personal History

Claimant was 24 years old on the date of the November 9, 2004 hearing before the ALJ. Claimant has an eleventh grade education. Claimant has prior relevant work experience as a ski repair technician, drywall finisher, electrician's helper, masonry tender, ski lift operator, and skidder operator for a logging company.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: October 28, 2002 – June 30, 2004.

**Sarita L. Bennett, D.O., 8/18/04, Tr. 114**
Patient has congenital valvular heart disease with bioprosthetic aortic valve replacement. He also has a history of endocarditis with complications resulting in a pacemaker placement. The patient has COPD, asthma, allergic rhinitis, bipolar disorder and general anxiety.

**Paola Pergami, M.D., 11/26/02, Tr. 148**
The patient suffers from endocarditis, fever, headache, and nausea. The patient has a bioprosthetic valve from 17 years of age.

**John Goddard, M.D. and Conard Failinger, M.D., 11/25/02, Tr. 150**
Impression: bioprosthetic aortic valve endocarditis with significant prosthetic aortic stenosis, probably due to patient-prosthetic mismatch. There is normal left ventricular systolic function and mitral valve prolapse equivocal for minimal mitral stenosis

**William Castillo, M.D., 11/18/02, Tr. 153**
Impression: The patient is status post #23 bioprosthetic aortic valve replacement. There is moderate aortic valve stenosis with instantaneous pressure gradient of 84 and mean pressure gradient of 50. There is abnormal aortic valve with redundant tissue, not typical but suggestive for aortic valve endocarditis. There is a small aortic ridge a few millimeters beneath aortic valve. There is mild mitral valve prolapse with trace mitral regurgitation. There is mild left ventricular hypertrophy with left ventricular posterior wall of 15mm and z-score of 3.0. The aortic arch is normal, as is the estimated right ventricular pressure.

**Jeffrey Hogg, M.D., 11/27/02, Tr. 158**
Impression: conglomeration of lymphadenopathy identified within the posterior left cervical chains with the maximum AP dimension measuring 4.3 cm as imaged on #24 and these likely represent adenitis.

**Robert Tallaksen, M.D., 11/25/02, Tr. 159**
Impression: Placement of PICC on the left with catheter tip in the proximal SVC.

**Ansaar Rai, M.D., 11/22/02, Tr. 160**
Impression: normal contrast enhanced MRI of the brain.

**Vickie Williams, M.D., 11/21/02, Tr. 162**
Impression: There is no evidence for active lung process or gross interval change since the previous study.

**Thuan-Phuong Nguyen, M.D., 11/20/02, Tr. 163**
Impression: unremarkable CT examination of the brain, as described above.

**Michael Cunningham, M.D., 11/20/02, Tr. 163**
Impression: unremarkable CT examination of the brain

**Michael Cunningham, M.D., 11/19/02, Tr. 164**
Impression: unremarkable ultrasound examination of the kidneys and bladder.

**Donald McDowell, M.D., 11/29/02, Tr. 178**
Conclusion: There is thrombus present in the distal left basilic vein.

**Thuan-Phuong Nguyen, M.D., 12/03/02, Tr. 179**
Impression: no acute parenchymal process demonstrated.

**Thuan-Phuong Nguyen, M.D., 12/09/02, Tr. 189**
Impression: minimal degenerative changes in both knees.

**John Sharp, D.O., 11/16/02, Tr. 192**
Impression: no evidence of pneumonia.

**Jason Shepherd, D.O., 1/29/03, Tr. 207**
Diagnosis: Status post remote aortic valve replacement and recent treatment for CNS prosthetic valve endocarditis. There is right lower extremity muscle spasm.

**Lakshmikumar Pillai, M.D., 1/29/03, Tr. 209**
Conclusion: no evidence of acute DVT, right lower extremity, chronic right lower extremity deep venous insufficiency.

**Robert Tallaksen, M.D., 1/29/03, Tr. 210**
Impression: shallow inspiration and postoperative changes. No acute pulmonary abnormality is seen.

**West Virginia University Hospitals, 3/13/03, Tr. 214**
Diagnosis: aortic valve replacement on February 10, 1997, and second aortic valve replacement on February 10, 2003, secondary to bacterial endocarditis with staphylococcus infection. Pacer placement on February 10, 2003. The patient has asthma. There is right trochanteric bursitis.

**William Castillo, M.D., 2/17/03, Tr. 216**
Comments/impression: The left atrium is mildly enlarged. The right atrium is normal in size. There is mild to moderate concentric left ventricular hypertrophy with left ventricular posterior wall thickness. There is trace tricuspid valve regurgitation with estimated right ventricular pressure of 30mmHg plus the mean pressure in the right atrium. There is mild, centric aortic prosthetic valve regurgitation.

**William Castillo, M.D., 2/13/03, Tr. 218**

Comments and impressions: There is trace mild mitral valve regurgitation.  There is mild tricuspid valve regurgitation, suboptimal for estimated right ventricular systolic pressure.

**West Virginia University Hospitals, 2/10/03, Tr. 222**
Operative findings: significant pannus formation was found underneath the aortic valve sewing ring.  Vegetations were found on the ventricular surface of the two bioprosthetic leaflets.  There is an aortic root abscess beginning at about 4 o'clock and extending around to about 10 o'clock causing an aortic ventricular disruption.

**West Virginia University Hospitals, 2/10/03, Tr. 223**
A temporary pacemaker was inserted into the right ventricle.

**Robert A. Gustafson, M.D., 2/10/03, Tr. 226**
Operative diagnosis: infected bioprosthetic aortic valve, aortic root abscess, recent onset complete heart block, mild concentric left ventricular hypertrophy, trace tricuspid regurgitation, trace mitral regurgitation, mild trans-bioprosthetic valve aortic stenosis, mitral valve prolapse.

**Robert Tallaksen, M.D., 2/18/03, Tr. 229**
Impression: New area of atelectasis at the left base but no other definite changes.

**Robert Tallaksen, M.D., 2/17/03, Tr. 230**
Impression: Postsurgical changes are seen within chest, with a small right pleural effusion and associated atelectasis.

**Robert Tallaksen, M.D., 2/17/03, Tr. 231**
Impression: decreased vascular prominence.

**Charlotte Dillis, M.D., 2/16/03, Tr. 232**
Impression: mild pulmonary vascular congestion which is stable.

**William Krantz, M.D., 2/14/03, Tr. 234**
Impression: postoperative change with cardiomegaly.  There is persistent density in the left lung base which may be resolving.

**William Krantz, M.D., 2/14/03, Tr. 235**
Impression: Stable postoperative changes with persistent density in the left lung base are seen.

**William Krantz, M.D., 2/13/03, Tr. 236**
Impression: there are postoperative changes in the mediastinum with areas of suspected atelectasis in the left lung base and right mid-lung.

**Robert Tallaksen, M.D., 2/11/03, Tr. 239**
Impression: There is decreased vascular prominence.

**Harshinder Singh, M.D., 2/9/03, Tr. 241**
Impression: normal coronaries, elevated right heart pressure, high grade AV block secondary to perivalvular abscess, status post successful temporary transvenous pacemaker insertion.

**Robert Tallaksen, M.D., 2/10/03, Tr. 287**
Impression: postoperative changes from aortic valve replacement. Vascular prominence is likely related to positioning.

**Mary Cannon, M.D., 2/9/03, Tr. 289-90**
Impression: equivocal findings for tiny dissection involving the ascending aorta just above the aortic root. There are postoperative changes of aortic valve repair and circumferential thickening of the left ventricular wall. There is hepatosplenomegaly.

**Andrew Mace, M.D., 2/7/03, Tr. 291**
Findings: There are patchy areas of heterogenous signal within bone marrow about the pelvis and proximal femurs due to areas of hematopoietic red marrow as well as fatty marrow.

**Thuan-Phong Nguyen, 2/6/03, Tr. 294**
Indication: pain

**Benjamin Siu, M.D., 3/4/03, Tr. 306**
Comments/impression: trivial paravalvular leak, mild mitral regurgitation, trivial tricuspid regurgitation, trivial pulmonary insufficiency, moderate concentric left ventricular hypertrophy

**Farrukh Jalisi, M.D., 1/8/03, Tr. 327**
Impression: bioprosthetic aortic valve endocarditis with significant prosthetic aortic valve stenosis, mitral valve prolapse, dilated (localized) aortic root, echo finding suggestive of root abscess.

**Physical Residual Functional Capacity Assessment, 6/30/03, Tr. 335**
Exertional limitations
       Occasionally lift and/or carry 20 pounds
       Frequently lift and/or carry 10 pounds
       Stand and/or walk about 6 hours in an 8 hour workday
       Sit for a total of about 6 hours in an 8 hour worday
       Push and/or pull: unlimited
Postural limitations
       Climbing ramps, stairs, ladder, rope, scaffold: occassionally
       Balancing: occassionally
       Stooping: occassionally
       Kneeeling: occassionally
       Crouching: occassionally
       Crawling: occassionally

**Randy Raissa Lagoc-Dingus, M.D. (Undated), Tr. 344**
The patient suffers from valvular heart disease with congenital bicuspid valve status post mechanical valve replacement, multiple infections of the heart valves with streptoccus with resulting open heart surgeries, complete heart block with permanent pacemaker, persistent arthritis and arthralagias as a result of rheumatic fever, general anxiety and depression related to bipolar disorder and anger control problems, asthma, insomnia, and acid reflux disease.

**Benjamin Siu, M.D., 12/5/03, Tr. 358**
The patient has an aortic valve replacement for infective endocarditis. He also has a dual chambered pacemaker for third degree heart block secondary to infective endocarditis. The patient suffers from chest tightness and shortness of breath.

**Benjamin Siu, M.D., 11/12/03, Tr. 361**
Impression: status post aortic valve replacement for bioprosthetic endocarditis, status post medtronic – DDD – seen.

**Benjamin Siu, M.D., 5/5/03, Tr. 364**
Impression: status post aortic valve replacement for bioprosthetic valve endocarditis, status post medtronic DDD pacemaker.

**Benjamin Siu, M.D., 2/5/03, Tr. 373**
Impression: bicuspid aortic valve, status post Baxter pericardial aortic bioprosthetic valve placement now with bioprosthetic valve vegetation and possibly aortic root abscess.

**Physical Residual Functional Capacity Assessment, 12/3/03, Tr. 376**
Exertional limitations
      Occasionally lift and/or carry 20 pounds
      Frequently lift and/or carry 10 pounds
      Stand and/or walk for a total of about 6 hours in an 8 hour workday
      Sit for a total of about 6 hours in an 8 hour workday
      Push and/or pull: unlimited

Postural limitations:
      Climbing ramps, stairs: occasionally
      Climbing ladder, ropes, scaffolds: never
      Balancing: occasionally
      Stooping: occasionally
      Kneeling: occasionally
      Crouching: occasionally
      Crawling: occasionally

Manipulative limitations:
      Reaching in all directions: unlimited
      Handling: unlimited

Fingering: unlimited
Feeling: unlimited

Visual limitations: none established
Communicative limitations: none established

Environmental limitations
       Extreme cold: avoid even moderate exposure
       Extreme heat: avoid even moderate exposure
       Wetness: unlimited
       Humidity: unlimited
       Noise: unlimited
       Vibration: avoid concentrated exposure
       Fumes, odors, dusts, gases, poor ventilation: avoid concentrated exposure
       Hazards: avoid concentrated exposure

**William E. Sharpe Jr. Hospital, 6/16/04, Tr. 446**
Diagnostic Impression: Polysubstance abuse, bipolar affective disorder, manic, possible explosive disorder, asthma, prosthetic mitral valve with pacemaker

**James Peykanu, M.D., 6/16/04, Tr. 452**
Diagnostic Impression: depressive disorder, NOS, rule out bipolar depressive phase versus major depressive disorder secondary to general medical condition versus substance induced mood disorder, opiate dependence, benzodiazepine dependence, multiple valve replacements for cardiac valve, history of endocarditis, history of asthma, social and family stressors, financial stressor, GAF: 40 to 45

**(Unspecified location & date), Tr. 458**
Diagnosis: volume depletion disorder (dehydration), bacterial infection due to unspecified staphylococcus, heart valve replacement status, asthma, without acute exacerbation, persistent disorder of initiating/maintaining sleep, pure hyperglyceridemia, esophageal reflux, constipation, enthesopathy of hip region

**Dr. Sarita Bennett, 11/8/04, Tr. 460**
(The following is from a questionnaire completed by Dr. Bennett. The questionnaire breaks at page 462 and continues at page 467).

Sustained concentration and persistence

       The ability to carry out very simple tasks and the ability to carry out detailed instructions: slightly limited.
       The ability to maintain attention for extended periods, the ability to maintain regular attendance and be punctual within customary tolerances, the ability to sustain an ordinary routine without supervision, the ability to work in coordination or proximity to others without being

unduly distracted by them, the ability to make simple work-related decisions, and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: moderately limited

Social interaction

The ability to ask simple questions or request assistance: slightly limited
The ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, the ability to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: moderately limited

Adaptation

The ability to respond appropriately to changes in routine work setting, and the ability to travel in unfamiliar places or use public transportation: slightly limited
The ability to be aware of normal hazards and take appropriate precautions, and the ability to set realistic goals or make plans independently of others: moderately limited

Diagnosis: bioprosthetic aortic valve, ventricular arrhythmia with pacemaker placement
Prognosis: stable

D.    Testimonial Evidence

Testimony was taken as follows:

[EXAMINATION OF CLAIMANT BY ATTORNEY]

Q    What was your last job?

    A    I was a, a electrician's helper at Snow Shoe, West Virginia.

    Q    And you had a - - you worked pretty much as often as you could after you were - -

even though you had the surgeries at seventeen, you didn't feel you were disabled, did you?

    A    Right, no.  I up until the time I was - - I worked about eight months straight there

before my last heart surgery and the last five months of it, I was working seven days a week.  I

was working four to five days a week doing electrical work and then the other ones I had like

Friday, Saturday or Sunday I was doing hanging and finishing drywall.

*       *       *

Q      How - - what are you able to do?  What's your average day like?

A      I get up, I take medicine.  I try to get myself breakfast, which usually consists of some cereal.  I try to eat right.  I walk around for a little bit and if I go outside, I, I have to put on a sweatshirt or something.  I can't I can't walk around that long at all without getting tired, so I have to sit down.  Sit in front of the TV, I guess.  I watch TV, news, whatever.  And around lunchtime, I'll get up and I'll eat and take more medicine.  In between there, I'm using the bathroom.  And then I usually take a two to three sometimes four hour nap.  There's sometimes where I go to sleep at two o'clock in the day time because I'm just so wore out that I'll sleep all night and all the next day until eight o'clock the next morning.  And I'll have to get woke up, you know, around six o'clock to take my blood thinners. And then I go back to sleep.  I don't lead a active life like I used to at one time.

Q      But sometimes you have trouble sleeping?

A      Yeah, sometimes - - I mean, it's not all the time that I get to sleep like that but there  is sometimes that - - I have a - - the mechanical valve I got in my head - - in my heart, it - - I hear a constant ticking in my head and it sounds like a clock.  And you know, if you sit here you could probably hear it.  There's times that I just can't go to sleep because of it.  I just, I'll be up and I'll be like you know trying to find something to do.  I try to sit down and read.  My concentration if, it wanders.  It goes from here to there and it just it, it seems like it's always getting thrown off by the ticking that's in my head.

Q      You take a lot of medicines?

A       Yeah.

Q       Do they have effects on you that bother as well as they help you?

A       Yeah.

Q       What are those?

A       I take (INAUDIBLE) which it - - I have to take it for my valve but it, it also gives me ringing in the ear, it gets me to where I'm colder.  It, it could be very hot and I could be really cold myself.  I get bruised really easy off of it.  I can't be out in the sunlight for a long period of time with it because of the sun factor it will - - between that and the Lasix I take it will it dries out the, the proteins and stuff that's in my body.  It causes me to get weaker, so where I'll have to go in and rest more.

*               *               *

Q       How does cold and fumes and dust and hot affect you?

A       Well, fumes and like dust and stuff like that - - the dust and stuff they gather into my lungs, causing me to cough and spew up quite frequent stuff that I have to use my asthma - - if I get like, like say pneumonia or something like from the from the dust, that's what would happen after a while.  It collects in my lungs and I start coughing up stuff.  When I start coughing, it really it puts a strain on my chest bone right through here and you know because it just it seems just like it was just put back together, but when I start coughing a lot, it's really irritable.  I just get I really get short of breath a lot.

Q       Do you have swelling in your legs?

A       Yes, sir.

Q       Do you do anything for that?

12

A       Well, if I'm sitting around the house, I'll prop my legs up and put them on a table. You know, I usually use the coffee table.  It's not good manners, but I do.  I yeah I wear these (INAUDIBLE) socks, (INAUDIBLE) hoses to keep the adema and the swelling down because sometimes my ankles and my legs swell up really huge.  I have to take a water pill every morning for that, so I just, I don't know.

*                    *                    *

Q       Do you socialize with people?

A       No.  I - - if I if I go to church and see them in church I socialize with them but as far as like going to a place like Wal-Mart or something like that, I get worried easily about what kind of colds are out there, you know, am I going to get sick again, am I going to find another bacteria that's going to put me in the hospital for a long amount of time again, you know, that's - - And I'm always worrying like where if whoever's with me, which most of the time is my mother, I'm always looking for her just to know that she's right there, you know, because if something happens to me, you know, who, who do I, you know, rely on to help me.  I was at the house yesterday and I took a chest pain  and some really tight breathing in my chest and my mother wasn't there and I had to call my sister.  Of course, I didn't I didn't think it was serious enough to call the ambulance so I had to call my sister and asked her come and sit with me until my mother got home.

Q       Karis, so we can go back a ways.  When you were - - even though you'd had, you know, your surgeries, you, you know.  At seventeen - - from seventeen until twenty-three or four, you were pretty normal, right?

A       Yes.

Q    What kind of stuff did you do?  I know you worked, it was hard work?

A    Yeah, I worked, I did rock mason work, I, I did electrical work, I did carpentry work, I did - - I used to run and play basketball and soccer tournaments.  I used to stay very active very active.  Now I don't.

Q    Do you hunt?

A    I used to.  I can't - - I tried hunting last year and we got not even a quarter mile and I had to go back to the vehicle and go home because between the cold air and walking, I was wore out.

Q    Do you fish?

A    I used to.

Q    Do you participate in any skiing activities or anything at Snow Shoe?

A    I, I used to snowboard but I don't I don't even get on a set of skis or a snowboard.

Q    What kind of pain do you experience regularly?

A    On a regular basis, I hurt in between just about every joint that I have in my body from the bacterial endocarditis.  They said that it would attack the joints, your heart, your brain.  For me, it did attack my joints and it did attack my heart.  I hurt a lot more up in my chest area here and both shoulder blades hurts right here.  I hurt in my back and in my neck.  I can't really sit for a long period of time without having to get up and stretch.  And I, I just I can't stand for a long period of time without, you know, my back and my chest start bothering me and I'm like bent over like this, you know.  It's, it's very, very tender there.

Q    Do you have stomach problems too?

A    Yes, I do.  I have acid reflux disease.  On, on top of the acid reflux, I have the

pacemaker which is in my stomach causing if, if I eat any kind of gassy foods, it causes gas to push out on the pacemaker itself.  I have to take Prevacid to help with that, it still doesn't help all the time.  A lot of stuff that I eat - - nine - - I don't know, about six out of ten times I end up throwing back up to make it comfortable on my stomach from this not being pushed out, my stomach  not  being pushed on the pacemaker.  They said when they move the battery back and move the wires which are attached to the outside of the heart instead of the inside, that they were going to put it up in my chest and not down here, because I was having such bad problems with it.

Q       What about headaches?

A       I get headaches very, very often.  I was in a car wreck a while - - well, a few years ago and it's messed up my neck.  I mean, it's not - - I don't know what all's wrong with it, but I get these tension  headaches  that are in the back and when I start getting tension headaches there, it'll start like straining the rest of the muscles back in the back of my neck and the and the right side of my shoulder causing it to get worse.

*             *             *

Q       Do you have trouble with your balance?

A       Yeah.

Q       Describe that for the Judge.

A       I'll be walking and sometimes I'll get light headed and I'll reach for things and I'll be off balance.  And I've, I've fell on numerous occasions.  If I'm in the shower I'll - - one time this last - - within the last year I was taking a shower and I got off balance - - I didn't slip - - I got kind of light headed and off balance and I fell and I busted my head and the ambulance had to come and get me.  I don't have no handrails up in the shower.  But if I'm walking there's a lot of

times you'll see me reach out to either touch a wall or a shelf or a desk or a table or something like that just to make sure that, you know, I'm not going to fall and if I do, I have something to protect me because if I fall and I hit myself a certain way in, in the chest area, I'm a goner. My heart depends on the pacemaker. If I fall and I get bruised, I run a severe chance of running blood clots. I remember one time when I hit my arm on a shelf, I bruised from up underneath my armpit all the way down under here and I had a knot almost the size of a baseball on my arm just from falling. I mean there's a lot.

*          *          *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]

Q      Mr. Pearis, could you characterize Mr. Rataiczak in terms of Social Security rules and regulations for his age category, educational level, and past work in terms of skill and exertion?

A      Yes, sir. Mr. Rataiczak is termed by Social Security to be a younger individual with a limited education. He's done a variety of work through jobs mainly for short periods of time. He has worked as an electrician's helper, which is semi-skilled work performed at the medium exertional level. He has worked as a drywall finisher, which is a skilled job performed at the medium exertional level. He's worked as a mason's helper, which is unskilled performed at the very heavy exertional level. He has worked as a ski lift operator, which is semi-skilled work performed at the light exertional level. He's worked as a skitter (Phonetic) operator, semi-skilled work at the medium exertional level. He's worked as a ski technician repairman, which is skilled, light work.

ALJ      And let's presume a hypothetical person who is as indicated by Dr. Stewart Exhibit

10F page four, his restrictions are that he should do no heavy lifting or isometric exercises or competitive contact sports, so he's supposed to avoid those activities.   Otherwise he has no restriction on activities. Otherwise he has no restriction on activities.  Let's presume that typically he could do 20 pounds lifting on an occasional basis, 10 pounds on a frequent basis and could stand and walk about six hours in an eight-hour day.  The same sit about six hours in an eight-hour day.  Be restricted to never climbing ladders, ropes, or scaffolds.  Occasionally could - - climb ramps and stairs and occasionally balance, stoop, kneel, crouch, crawl.  He should avoid even moderate exposure to extreme cold or extreme heat.  He should avoid concentrated exposure to vibrations, fumes, odors, dust, gases, poor ventilation and also avoid concentrated exposure to hazards.  And, of course, with the cumoden (Phonetic) he's at risk for any kind of minor cuts, so he should not work in any kind of dangerous activity around sharp environments that could cause injury.  And, and with those type limitations, are there any kind of jobs that he could do in the national economy?

A       Yes, sir.  He could work a cashier position.  There's more than nine hundred thousand of those jobs nationally, more than thirty-two thousand of them within the region, with the region being West Virginia and Virginia.  That is a light job performed at the unskilled level. He could work at - -

Q       How many did you say in West Virginia and Virginia?

A       West Virginia/Virginia thirty-two thousand plus.

Q       Thirty-two thousand?

A       Yes, sir.  That is light and that is unskilled.   He could work as, as a mail clerk. There's almost seventy-five thousand of those jobs nationally, more than twenty-nine hundred of

those within the two Virginias.  Again, that's light and unskilled.  He could work as a shipping/receiving clerk, sixty-four thousand plus nationally of those jobs.  And more than sixteen hundred of those within the region, the two Virginias.  Again, that's light and that's unskilled work.

Q       Assuming there's a - - diagnosed with a depressive rule - - disorder, also rule out bipolar depressive phase versus major depressive disorder secondary to general medical induced versus substance induced disorder.  Opiate dependence (INAUDIBLE) dependence, history of alcohol abuse and dependence, and history of bipolar disorder Type I and that he would as closer to diagnosis given Exhibit 15F from recent hospitalization June of '04 and he's been indicated by mental impairment questionnaire to Dr. Bennett.  The ability to carry out underneath slightly limited, moderately limited, markedly limited, extremely limited with that definition other than slight limitations that would only minimally interfere with the person's ability to function, moderate limitation would interfere with the ability to function independently (INAUDIBLE) affecting the particular activity irregularly and generally not be serious enough to preclude competitive work activity.  However, the individual with a moderate limitation in three or more areas (INAUDIBLE) of unskilled work (INAUDIBLE) would amount to a marked limitation for that type of work.  Add to it the combination impairments which prevent (INAUDIBLE) from performing competitive unskilled work would seem to be a marked limitation which would preclude the individual from effectively performing a particular activity.  Now with those definitions, it says only slightly moderate - - slightly limited and moderately limited are listed and there is no particular limit.  The (INAUDIBLE) limit is not indicated on there for these particular abilities.  Let me give that to you.  Let's see Exhibit 19F, which is both pages and Exhibit 20F has

the signature page.  And presumably the limitations are as indicated in the first hypothetical.

A      Okay, just a second.  Can you read the definition again?

Q      Well, he has more than three moderates.

A      Yes, he has more than three moderates and - -

Q      So it would be markedly limited?

A      - - and that would I think jeopardize any employment.

Q      Okay.  Okay, Mr. Foreman?  Ah, wait a minute.  Is there anything in your testimony that conflicts with the <u>Dictionary of Occupational Titles</u>, Mr.  Pearis?

A      Not to my knowledge.

*       *       *

ATTY No, sir.  I just want to ask him, assuming the limitations my client has testified to to be accurate, would he believe those jobs could be performed or any jobs?

ALJ      Go ahead and answer that, Mr. Pearis.

VE      If the Judge finds his testimony to be creditable, no there would not be jobs that he could.  It would severely limit all of those.

RE-EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY:

Q      Okay.  Now, assuming that as per the RFC of Dr. Bennett, that he has dizziness and fatigue after thirty to sixty minutes of minimal exertion, chest pain aggravated by stress upon minimal exertion, depression, anxiety and pain which often interferes with attention and concentration.  And that he can only walk one half a block, sit or stand two plus hours at a time, needs frequent unscheduled breaks based upon his conditions which require forty-five minutes of rest, and that he must sit with his legs elevated to his hip level approximately eight hours per day.

Would your answer - - what would your answer be as to those specific jobs you've indicated?

A    My answer would be that he could not work.

\*            \*            \*

E.    Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affected his daily life.

• Dusted furniture (Tr. 87)

• Washed dishes (Tr. 87)

• Took out the trash (Tr. 87)

• Shopped for food and medication for a maximum of ten to fifteen minutes (Tr. 88)

• Read magazines, newspapers, and books (Tr. 88)

• Listened to radio, records, and tapes (Tr. 88)

• Watched movies as a hobby (Tr. 88)

• Made necklaces and bracelets with yarn (Tr. 88)

• Lifted a television (Tr. 349)

• Was addicted to opiates (Tr. 444)

• Was addicted to alcohol and street drugs from the beginning of the relevant period until mid-2004 (Tr. 495)

• Fixed his own breakfast (Tr. 497)

• Watched television (Tr. 497)

### III. The Motions for Summary Judgment

A.     Contentions of the Parties

Waugh raises four arguments of error against the ALJ's decision.  First, she contends the ALJ erred in failing to consider some of Claimant's impairments severe.  Second, she argues Claimant should have been found disabled at step three of the sequential evaluation process under listings 4.05 and 4.07.  Third, Waugh argues the ALJ improperly discredited the subjective complaints raised by Claimant.  Fourth, Waugh contends the ALJ posed an improper hypothetical to the Vocational Expert.  She argues the hypothetical should have included other impairments alleged by Claimant.  As a fifth argument, Waugh asks this Court to remand the case to Commissioner based on the new and material evidence of Claimant's death from the condition from which he alleged disability.

Commissioner maintains that the ALJ properly determined Claimant did not suffer from a disability.  Commissioner counters the argument that the ALJ improperly failed to find Claimant suffered from other severe impairments by noting the ALJ found severe precisely the impairments Waugh alleges he did not.  Secondly, Commissioner argues the ALJ properly found Claimant not disabled at the third step of the evaluation process by not crediting Dr. Bennett's testimony.  She argues Bennett's testimony did not have substantial support in the record.  Commissioner also argues the ALJ properly evaluated Claimant's subjective complaints.  Fourth, Commissioner asserts the ALJ properly included all Claimant's limitations in his hypothetical to the Vocational Expert.  Finally, Commissioner contends Claimant's death and, in particular, the death certificate submitted, do not constitute sufficient evidence for this Court to remand the case.

B.     The Standards.

1.     <u>Summary Judgment</u>.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  <u>Matsushita Elec.  Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  <u>Anderson v.  Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).

2.     <u>Judicial Review</u>.  Only a final determination of the Commissioner may receive judicial review.  <u>See</u>, 42 U.S.C. §405(g), (h); <u>Adams v. Heckler</u>, 799 F.2d 131,133 (4th Cir. 1986).

3.     <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.     <u>Social Security - Medically Determinable Impairment</u>.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508,

416.908.

5.      <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.      <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.      <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.      <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      <u>Social Security - Sequential Analysis</u>.  To determine whether Claimant is disabled,

the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.    Discussion

I.

The Motion to Remand

This Court will first consider the argument it should remand this case based on the evidence of Claimant's death. If Claimant's death does satisfy the statutory requirements for remand, this Court may avoid ruling on the other arguments of error.

For this Court to order remand based on additional evidence, Waugh must present new and material evidence the ALJ did not have available at the prior proceeding. 42 U.S.C. § 405(g). Waugh must also present good cause for the failure to incorporate the evidence at the prior proceeding. Id. The Fourth Circuit has held that evidence is new "if it is not duplicative or cumulative." Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991). A piece of evidence "is material if there is a reasonable possibility that the new evidence would have changed the outcome." Id. Additionally, the evidence must bear on "the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). Simply

because the evidence must bear on the period on or before the ALJ's decision does not mean it must have existed at that time. <u>Wooldridge v. Bowen</u>, 816 F.2d 157, 160 (4th Cir. 1987). As long as the evidence relates to whether Claimant had a disability during the relevant time period, the Court should consider it. <u>Id.</u>

In this case the supposedly new and material evidence is Claimant's death certificate, which counsel has attached with the Motion to Remand. The certificate states Claimant's death occurred on June 28, 2006 due to "cardiac dysrhythmia due to aortic stenosis & prosthetic aortic valve replacement."

The evidence contained in the death certificate fails the tests of newness and materiality. The death certificate contains two potentially relevant pieces of evidence: (1) the fact of Claimant's death, and (2) that Claimant died from "cardiac dysrhythmia due to aortic stenosis & prosthetic aortic valve replacement." As to the first part, the reality of Claimant's death is obviously new evidence. Yet it is not material since it is not likely to change the outcome of the case. <u>Wilkins</u>, 953 F.2d at 96. Claimant died only two days short of two years after the last day on which he could show disability. This represents a considerable length of time. Furthermore, the seriousness of Claimant's condition was already well known, if only by the fact that he underwent two surgeries to repair his aortic valve. (Tr. 214). Regarding the second piece of evidence, that statement fails on both newness and materiality. The statement is not new, but rather duplicative and cumulative of the evidence already in the record. <u>Wilkins</u>, 953 F.2d at 96. The record is replete with references to this ailment. (Tr. 114, 148, 150, 153, 214, 216, 223, 344). The evidence also fails the test of materiality since the death certificate restates evidence already well known, as mentioned above regarding the serious state of Claimant's condition.

II.

## Claimant's Other Alleged Severe Impairments

Waugh next argues the ALJ committed error by failing to find Claimant had other impairments qualifying as severe within the meaning of the Regulations. An impairment is severe when, whether by itself or in combination with other impairments, it significantly limits a claimant's physical or mental abilities to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a). See also Byrd v. Apfel, No. 98-1781, slip op. at 2 (4th Cir. Dec. 31, 1998);[11] Social Security Ruling 85-28. "Congress explicitly requires that 'the combined effect of all the individual's impairments' be considered 'without regard to whether any such impairment if considered separately' would be sufficiently severe." Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989) (citations omitted). "[T]he Secretary must consider the combined effect of a claimant's impairments and not fragmentize them." Id. "[T]he ALJ must adequately explain his or her evaluation of the combined effects of the impairments." Id.

The ALJ in this case found Claimant suffered from four severe impairments. He determined Claimant had the severe ailments of aortic valve replacement, pacemaker placement, asthma, and chronic obstructive pulmonary disease. (Tr. 20). While it is not entirely clear from Plaintiff's argument which other impairments she believes the ALJ should have found, the Court believes she argues the ALJ should have found Claimant's impairments of dizziness, fatigue after minimal exertion, depression, anxiety, an easy propensity for bruising, increased bleeding from

_____

[11]

 This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions. I recognize the reasons for that position and acknowledge it. Unfortunately, there is not a better indicator of what its decision might be in this regard.

26

medicine, the need to elevate his legs, the need for frequent breaks, and the need to avoid lung irritants as severe.[12] Pl.'s Br. at 7. The Court will uphold the ALJ's findings that these impairments are not severe as long as substantial evidence exists to support them. Hays, 907 F.2d at 1456.

Substantial evidence does exist to support the ALJ's findings. First, the ALJ considered whether Claimant's depression and anxiety imposed severe limitations on his life and concluded they did not. (Tr. 20). The ALJ found Claimant retained the ability to perform basic activities, specifically noting Claimant prepared his own meals, washed dishes, took out the trash, dusted, shopped for food and medications, watched television, listened to music, made necklaces, and received regular visits from relatives. Id. The record also indicates Claimant had a girlfriend during the relevant time. (Tr. 87). The ALJ determined that since Claimant could still perform all of these activities in spite of his depression and anxiety, they did not impose severe impairments. Id. The Court concludes this presents substantial evidence to support the ALJ's findings. Regarding the remainder of Claimant's alleged ailments, Dr. Bennett's own report indicates these ailments are not independent conditions, but are rather symptoms of Claimant's heart difficulties. (Tr. 467-69). Claimant suffered from dizziness, easy bruising, fatigue, etc. because of his heart condition. Therefore, the ALJ found these impairments severe by finding Claimant's heart conditions represented severe ailments.

III.

---

[12] Plaintiff also mentions some impairments the ALJ did find as severe, such as chronic obstructive pulmonary disease, valve replacement and pacemaker insertion. Since the ALJ did find these impairments severe, the Court will not again consider them. As mentioned above, Plaintiff's discussion of this topic is difficult to follow.

<u>Claimant's Impairments Analyzed Under §§ 4.05 and 4.07</u>

Waugh next argues Claimant should have been found disabled at the third step of the

evaluation process, 20 C.F.R. § 1520, because he met the requirements for §§ 4.05 and 4.07.

First, § 4.05 deals with recurrent arrhythmias.  20 C.F.R. pt. 404, subpt. P, app. 1, § 4.05.  To find

disability, this section requires

> recurrent arrhythmias, not related to reversible causes, such as electrolyte
> abnormalities or digitalis glycoside or antiarrhythmic drug toxicity, resulting in
> uncontrolled, recurrent episodes of cardiac syncope or near syncope, despite
> prescribed treatment, and documented by resting or ambulatory (Holter)
> electrocardiography, or by other appropriate medically acceptable testing,
> coincident with the occurrence of syncope or near syncope.[13]

<u>Id.</u>  (citations omitted).

The ALJ here found Claimant did not meet the requirements of this section.  In doing so,

he relied on the opinion of Claimant's cardiologist, Dr. Siu.  (Tr. 20).  The ALJ explicitly refused

to credit the opinion of Dr. Bennett, who had opined Claimant met the requirements for this

section.  (Tr. 20; 465).  Claimant contends the ALJ erred by refusing to credit Dr. Bennett's

opinion.  The Court will uphold the ALJ's findings as long as they have substantial evidence to

support them.  <u>Hays</u>, 907 F.2d at 1456.

A treating physician's opinion will be entitled to controlling weight under some

circumstances.  The opinion must be 1) well supported by medically acceptable clinical and

laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the

case record.  20 C.F.R. § 416.972(d)(2).  A treating physician's opinion will be disregarded if

---

[13] As defined by Dorland's Illustrated Medical Dictionary 1747 (28th ed. 2000), a cardiac
syncope refers to a "sudden loss of consciousness, with momentary or no premonitory
symptoms, due to cerebral anemia caused by obstructions to cardiac output or arrhythmias such
as ventricular asystole, extreme bradycardia, or ventricular tachycardia."

persuasive contrary evidence exists. Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984). To decide whether an impairment is adequately supported by medical evidence, the Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); 20 C.F.R. § 404.1508; Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990). Regardless of a physician's opinion, the ultimate legal determination of Claimant's impairments remains with the Commissioner. 20 C.F.R. § 404.1527(d)(2); (e)(2); McLain v. Schweiker, 715 F.2d 866, 869 (4th Cir. 1983).

The Court concludes the ALJ was justified in not crediting Dr. Bennett's opinion that Claimant met the disability requirements of 4.05 and 4.07. The ALJ properly determined Dr. Bennett's opinion went against other substantial evidence of record and therefore should not receive controlling weight. 20 C.F.R. § 416.972(d)(2). First, as stated above, § 4.05 requires "the occurrence of syncope or near syncope." Yet several reports in the record indicate Claimant denied syncope. (Tr. 360, 363, 367). Second, 4.05 speaks of proof by electrocardiography. In December 2003, Dr. Siu reported an electrocardiogram of Claimant showed only "appropriate" findings. (Tr. 358). Finally, nowhere does Dr. Bennett explain why he believes Claimant meets the requirements for 4.05 and 4.07. (Tr. 465). He simply states the matter in one sentence and leaves it at that. Id. All of this lends substantial weight to the ALJ's decision to credit Dr. Siu's testimony over Dr. Bennett's. Thus, substantial evidence supports the ALJ's decision to find Claimant not disabled under 4.05.

The Court will next consider whether the ALJ erred in finding Claimant not disabled under § 4.07, dealing with valvular heart disease. This section requires Claimant to show

"valvular heart disease or other stenotic defects, or valvular regurgitation, documented by appropriate imaging techniques or cardiac catheterization. Evaluate under the criteria in 4.02, 4.04, 4.05, or 11.04." 20 C.F.R. pt. 404, subpt. P, app. 1, § 4.07.[14] To meet the criteria for § 4.02, Plaintiff must show the following:

A. Medically documented presence of one of the following:

1. Systolic failure, with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure) (citations omitted); or

2. Diastolic failure, with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure) (citations omitted);

AND

B. Resulting in one of the following:

1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12-month period, with evidence of fluid retention from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (citations omitted); or

3. Inability to perform an exercise tolerance test at a workload equivalent to 5 METs or less due to:

---

[14] The Court could not find this regulation on Lexis or the Social Security website. This information was obtained at http://marthachurchill.com/sslist04.htm (last visited September 12, 2006). Section 4.07 was deleted earlier this year. 71 Fed. Reg. 2318.

a.  Dyspnea, fatigue, palpitations, or chest discomfort; or

b.  Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute (citations omitted); or

c.  Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic blood pressure measured during exercise due to ventricular dysfunction, despite an increase in workload; or

d.  Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

To qualify under 4.04, the following must be shown:

A.  Sign - or symptom - limited exercise tolerance demonstrating at least one of the following manifestations at a workload of 5 METs or less:

1.  Horizontal or downsloping depression, in the absence of digitalis glycoside treatment or hypokalemia, of the ST segment of at least - 0.10 millivolts (-1.0 mm) in at least 3 consecutive complexes that are on a level baseline in any lead other than a VR, and depression of at least -0.10 millivolts lasting for at least 1 minute of recovery; or

2.  At least .1 millivolt (1 mm) ST elevation above resting baseline in non-infarct leads during both exercise and 1 or more minutes of recovery; or

3.  Decrease of 10 mm Hg or more in systolic pressure below the baseline blood pressure or the preceding systolic pressure measured during exercise due to left ventricular dysfunction, despite an increase in workload (citations omitted); or

4.  Documented ischemia at an exercise level equivalent to 5 METs or less on appropriate medically acceptable imaging, such as radionuclide perfusion scans or stress echocardiography.

OR

B.  Three separate ischemic episodes, each requiring revascularization or not amenable to revascularization, within a consecutive 12 month period.  (citations omitted)

OR

C.  Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of a timely exercise tolerance test or a timely normal drug induced stress test, an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance testing would present a significant risk to the individual, with both 1 and 2:

1.  Angiographic evidence showing:

a.  50 percent or more narrowing of a nonbypassed left main coronary artery; or

b.  70 percent or more narrowing of another nonbypassed coronary artery; or

c.  50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or

d.  50 percent or more narrowing of at least 2 nonbypassed coronary arteries; or

e.  70 percent or more narrowing of a bypass graft vessel; and

2.  Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.

The standard for 4.05 is already stated above.  To qualify under § 11.04, it must be shown a person has "one of the following more than 3 months post-vascular accident: A. Sensory or motor aphasia resulting in ineffective speech or communication; or B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (citations omitted)."

Plaintiff's argument that Claimant met the requirements of 4.07 lacks merit.[15]  First, Claimant fails under 4.02A.  Claimant's heart problems resulted from issues with a valve.  (Tr. 363).  Claimant also had bacterial problems on his atrioventricular node, necessitating a pacemaker placement.  Id.  His issues were not systolic or diastolic.  Id.  Even if Claimant could meet the requirements of A, he would fail the requirements of 4.02B.  Claimant did not satisfy B(1) because he did exhibit symptoms seriously limiting daily activities.  In November 2003, Dr. Siu found Claimant capable of all but "heavy lifting or isometric exercise and competitive contact sports."  (Tr. 361).  Furthermore, as the ALJ noted, Claimant himself admitted he had the ability to dust, wash dishes, take out the trash, watch television, and listen to music.  (Tr. 20).  Claimant's condition fails the test of B(2) because the record contains no evidence of congestive heart failure.  Finally, Claimant's condition fails B(3) because there is no evidence of a doctor giving him an exercise test.

Claimant's ailments also fail the test of 4.04 and 4.05.  They fail 4.04A because, as stated above, there is no evidence of an exercise test being performed on Claimant.  They fail 4.04B because Claimant did not exhibit ischemic episodes.  Even Dr. Bennett, upon whom Plaintiff relies, wrote that any EKG changes in Claimant were not ischemic.  (Tr. 465).  Finally, Claimant's ailments fail 4.04C because even though Claimant did need an aortic valve replacement, no doctor concluded a stress test would place him at significant risk.  The reasons Claimant does not meet 4.05 have already been stated above and need not be reiterated here.

_____

[15] It is worth noting that Plaintiff's brief does not contain any reasons why Claimant should be found to meet the listings of this section.  It simply makes a bare assertion that he does.

Finally, Claimant's heart condition does not satisfy 11.04. This section requires severe motor dysfunction, and there is absolutely no evidence in the record Claimant exhibited any of these symptoms. A physical residual functional capacity assessment conducted in December 2003 found no communicative limitations. (Tr. 380). It also found Claimant had unlimited ability to reach, handle, finger, and feel. (Tr. 379). Clearly, Claimant did not satisfy this section.

IV.

The ALJ's Assessment of Claimant's Credibility

Plaintiff next argues the ALJ erred by failing to fully credit Claimant's subjective complaints regarding his disability. The Fourth Circuit considered the manner in which ALJs should consider a claimant's subjective complaints of symptoms in Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). Before an ALJ considers a person's subjective complaints, the person making the complaints must show "objective medical evidence [of] a medical impairment reasonably likely to cause the" symptoms alleged. Id. at 595. A person does not need to show objective evidence of the subjective symptoms themselves, but rather only objective evidence of an impairment that could reasonably be expected to cause the alleged symptoms. Id. If this showing is made, the ALJ should consider "the intensity and persistence" of a person's symptoms, as well as the effect they have on the persons's ability to retain employment. Id. The ALJ should evaluate all available evidence when determining if the subjective complaints are credible. Id. The ALJ does not need to accept a claimant's allegations if they "inconsistent with the available evidence." Id. As always, it is the duty of the ALJ to make factual findings and to resolve discrepancies in the evidence. Hays, 907 F.2d at 1456.

Only months after the Fourth Circuit decided Craig, Commissioner published Social

34

Security Ruling (SSR) 96-7p, which also helped to clarify the standard for evaluating a person's subjective complaints. This ruling essentially accepted the holding of <u>Craig</u>. It held that "When the existence of a medically determinable . . . impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects . . . must be evaluated." Like <u>Craig</u>, it also required the ALJ to consider "the entire record" when determining whether the subjective symptoms were credible.

In this case, the ALJ found Claimant's subjective complaints only partially credible. (Tr. 22). At the hearing, Claimant testified his impairments cause severe restrictions in his daily life. (Tr. 497). He testified his ailments caused his average day to consist of little more than eating, sleeping, and using the bathroom. <u>Id.</u> The ALJ found Claimant had the impairments of asthma, chronic obstructive pulmonary disease, pacemaker placement, and aortic valve replacement that could produce these symptoms. (Tr. 21). In accord with <u>Craig</u> and SSR 96-7p, the ALJ evaluated whether the symptoms Claimant alleged were credible.[16] (Tr. 21-22). The ALJ found Claimant's symptoms only partially credible due to inconsistencies between his testimony and the record. (Tr. 22). The ALJ noted that while Claimant testified his ailments caused almost complete disability, the records indicated Claimant could do light household chores and shop for groceries. <u>Id.</u> He also noted Claimant attended church, visited relatives, and had a girlfriend. <u>Id.</u> This Court will sustain the ALJ's findings as long as they have substantial evidence to support them. <u>Hays</u>, 907 F.2d at 1456.

Substantial evidence exists to sustain the ALJ's finding Claimant's testimony was only partially credible. First, there is the evidence detailed above. Additionally, in May 2003, Dr. Siu

[16] The ALJ explicitly mentioned <u>Craig</u> and SSR 96-7p.

noted Claimant could ride a bicycle for three miles, although he had to rest every several thousand yards. (Tr. 363). In November 2003, Dr. Siu found Claimant's impairments limited him only in that he could not perform heavy lifting, isometric exercises, or competitive contact sports. (Tr. 361). Although Claimant did complain of diminished physical capability, Dr. Siu found this came from an overall decrease in aerobic capacity rather than one of Claimant's heart conditions. (Tr. 358). This evidence plainly contradicts Claimant's assertion that his medical conditions caused him to be able to do virtually nothing outside the house. Finally, to the extent Claimant's subjective complaints were credible, the ALJ adequately accounted for them by following Dr. Go's recommendation that Claimant be limited to light work. (Tr. 22, 381).

V.

The ALJ's Hypothetical Question to the Vocational Expert

Plaintiff finally argues the ALJ erred by failing to include all of Claimant's limitations in his hypothetical question to the Vocational Expert. The Fourth Circuit has held that proper questions to a Vocational Expert must incorporate all evidence. Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). However, the Court has also held, albeit in an unpublished opinion, that while questions to a Vocational Expert must fairly set out all of Claimant's impairments, the questions need only reflect those impairments supported by the record. Russell v. Barnhart, No. 02-1201, 2003 WL 257494, at *4 (4th Cir. Feb. 7, 2003). The Russell Court further stated that the hypothetical question may omit non-severe impairments, but must include those the ALJ finds severe. Id.

In this case, the ALJ asked the Vocational Expert to assume a person who could do no heavy lifting, isometric exercises, or competitive contact sports, who could lift twenty pounds

occasionally and 10 pounds frequently, who could stand and walk about six hours in an eight hour day, who could never climb ropes, ladders, or scaffolds, but who could occasionally climb ramps and stairs and occasionally balance, kneel, stoop, crouch, and crawl, who would need to avoid even moderate exposure to extreme temperatures, who would need to avoid concentrated exposure to fumes, vibrations, odors, dust, gases, and poor ventilation, and who would need to avoid concentrated exposure to hazards. (Tr. 507). The ALJ also said the hypothetical person should avoid exposure to dangerous activity involving sharp objects. Id.

The ALJ asked his hypothetical question in this case while having found Claimant suffered from in mind Claimant's severe heart problems, asthma, and chronic obstructive pulmonary disease. Limitations resulting from asthma and chronic obstructive pulmonary disease are evident by the limitations of the need to avoid fumes, odors, gases, and poor ventilation. (Tr. 507). Limitations from Claimant's heart condition are also evident in that the hypothetical person was restricted from isometric exercises or contact sports, which is a limitation Dr. Siu, Claimant's cardiologist, advised. (Tr. 361, 507). Most of the limitations in the ALJ's hypothetical came from a physical residual functional capacity assessment by Dr. Go. (Tr. 22, 376-83). Dr. Go was aware of Claimant's heart and respiratory problems. (Tr. 376). Indeed, he wrote that Claimant "alleges aortic valve replacement, anemia, tires easily, shortness of breath, and dizzy spells. His easy fatigue, shortness of breath, dizzy spells, anemia a credible partially, and they will restrict him to do only light work." (Tr. 381). Dr. Go found Claimant capable of light work in spite of all these limitations. Id. He found Claimant could never climb ramps or stairs and could only occasionally balance, stoop, kneel, crouch, or crawl. (Tr. 378). He also found Claimant had no visual or communicative limitations and had unlimited manipulative ability. (Tr. 379-80). Dr.

Go found Claimant should avoid even moderate exposure to extreme temperatures, should avoid concentrated exposure to fumes, odors, gases, and poor ventilation, and hazards, and could take unlimited exposure to wetness, humidity, and noise. (Tr. 380). The ALJ asked his hypothetical with these limitations in mind.

Plaintiff argues this hypothetical failed to adequately describe all Claimant's limitations. Specifically, Plaintiff contends the hypothetical should have included that Claimant suffered from depression, anxiety, pain interfering with his attention and concentration, dizziness, fatigue, congenital heart disease, asthma, chronic obstructive pulmonary disorder, chronic deep leg venous insufficiency, chronic pain syndrome, panic disorder, and endocarditis. Plaintiff also argues the hypothetical should have included that Claimant needed unscheduled breaks and forty five minute rest periods.

Analysis reveals the ALJ asked a proper hypothetical question to the Vocational Expert. First is the proposition that the ALJ only had a duty to account for severe impairments. Russell, 2003 WL 257494, at *4. This means the ALJ had a duty to account for Claimant's heart problems, asthma, and chronic obstructive pulmonary disorder. (Tr. 20). The hypothetical question properly accounted for all these conditions. Claimant's asthma and chronic obstructive pulmonary disorder received attention in the limitation to avoid fumes, gases, poor ventilation, and odors. (Tr. 507). Claimant's heart condition received attention in the restrictions against heavy lifting, isometric exercises, and contact sports. Id. Presumably many of the other limitations also came from Claimant's heart condition since Dr. Go stated he knew of Claimant's aortic valve replacement and most of the record concerns Claimant's heart problems. (Tr. 381). Second, the ALJ did not have to include limitations from other non-severe impairments.

Russell, 2003 WL 257494, at *4. The remainder of the impairments Plaintiff alleges the ALJ

should have considered were found to be non-severe.[17]  Since an impairment must be severe for

the ALJ to be required to include limitations from it in his hypotheticals to the Vocational Expert,

the question is really whether any of the remaining impairments are severe.  Russell, 2003 WL

257494, at *4.  The Court will sustain the ALJ concerning the severity of these impairments so

long as substantial evidence exists to support his conclusion.  Hays, 907 F.2d at 1456.

     Substantial evidence does exist to sustain the ALJ.  As previously mentioned, the ALJ

found Claimant's impairments of depression and anxiety did not constitute severe limitations and

substantial evidence exists to support this conclusion.  (Tr. 20, 87-88).  The same can be said

about Claimant's pain disorder.  Regarding problems with attention and concentration, Claimant

testified to these limitations at the hearing, but the ALJ found these problems not severe.  (Tr. 22).

Substantial evidence supports this conclusion, for in June 2004 Claimant was reported to have

"no thought transference or blocking or insertion."  (Tr. 445).  He was also reported to have good

judgment.  Id.  Limitations from endocarditis were part of the Claimant's heart problems.  (Tr.

358).  As for dizziness and fatigue, Dr. Bennett's report indicates this is a symptom of Claimant's

heart problems, so the ALJ included this limitation with his finding of severity in Claimant's heart

problems.  (Tr. 22, 467).  Regarding the lack of limitations from chronic deep leg venous

---

[17] While the ALJ did not specifically consider all the impairments listed by Plaintiff, this
was not required.  The Seventh Circuit has held that a written evaluation of every piece of
evidence is not required, so long as the ALJ articulates at some minimum level his analysis of a
particular line of evidence.  Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995).  Also, the Eighth
Circuit has held that the ALJ's mere failure to cite specific evidence does not establish that he
failed to consider it.  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).  See also Walker v.
Sec'y of Health & Human Servs., 884 F.2d 241, 245 (6th Cir. 1989) (reviewing court may
examine all the evidence, even if it has not been cited by the ALJ).

insufficiency and the lack of a need for 45 minute rest periods, even Dr. Bennett found Claimant could stand for more than two hours at a time. (Tr. 468). As to chronic pain syndrome, Claimant's pain did not appear to significantly inhibit his daily activities, and much of his pain stemmed from his heart condition and thereby was included in the ALJ's finding the heart condition represented a severe impairment. (Tr. 87-88, 369). Finally, while Plaintiff argues the ALJ should have included a limitation requiring Claimant to be able to take unscheduled forty five minute breaks, this comes from a report by Dr. Bennett, which the ALJ found entitled to little credence. (Tr. 22). The ALJ noted there was no support for Dr. Bennett's recommendation in the record and it even contradicted her own findings. Id. Thus, none of these impairments needed to be included in the ALJ's hypothetical.

Finally, the Court notes that while it recommends sustaining the ALJ's finding that Claimant was not disabled, this is more a problem with the Regulations than with what Claimant's actual condition was. The record makes clear Claimant suffered from severe heart problems that would eventually lead to his death. He conditions required constant medical care. Thus, while Claimant did not meet the legal requirements for disability, the Court acknowledges he had many severe medical problems that many people would probably consider disabling.

## IV. Recommendation

For the foregoing reasons, I recommend that:

    1. Claimant's Motion for Summary Judgment be DENIED.

    2. Commissioner's Motion for Summary Judgment be GRANTED because substantial

evidence supports the ALJ's determination to find other impairments were not severe, to conclude Claimant did not meet the requirements for disability at the third step of the disability evaluation process, to find Claimant's testimony only partially credible, and because the ALJ asked a proper hypothetical to the Vocational Expert. Finally, Claimant's death does not present grounds for remand since it is not new and material evidence.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to parties who appear *pro se* and all counsel of record, as applicable, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

DATED: September 21, 2006

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE